**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DIAMOND K MEATS, INC. ET AL. | |
| v. | Case No. 1:15-cv-01634-DAP |
| AUNTY TOOTIES, LLC | |

## <u>DEFENDANT AQUASEA GROUP LLC'S ANSWER AND COUNTERCLAIMS</u>

Defendant Aquasea Group, LLC ("Defendant"), through undersigned counsel, hereby responds to Diamond K Meats, et al. ("Plaintiffs") as follows:

### THE PARTIES

1.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

2.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

3.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

4.      Admitted as to the first sentence, denied as to the second sentence.

5.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

6.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

7.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

8.      The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

9.      The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

**THE DISPUTE**

10.      The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

11.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

**FACTUAL ALLEGATIONS – DIAMOND K**

12.      Denied.

13.      Denied.

13a.      Denied as to the assertion that Defendants owe Diamond K $3,200 in storage and cartage fees. As to the rest of the paragraph, Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

14.     Denied.

## FACTUAL ALLEGATIONS – VENNITTI

15.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

16.     Denied as to the assertion that Vennitti was not paid any money by Aquasea. As to the rest of the paragraph, Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

17.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

## COUNT ONE

18.     Denied.

19.     The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

20.     Denied.

21.     Denied.

22.     Denied.

23.     Denied.

## COUNT TWO

24.     Denied.

25.     Denied.

26.     Denied.

27.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

28.     Denied.

## COUNT THREE

29.     Denied.

30.     The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

31.     Denied.

32.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

## COUNT FOUR

33.     Denied.

34.     Denied.

35.     Denied.

36.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

37.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

38.     Denied.

39.     Denied.

40.     Denied.

## COUNT FIVE

41.     Denied.

42.     Denied.

43.     Denied.

44.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

45.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

46.     Denied.

47.     The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

48.     Denied.

**COUNT SIX**

49.     Denied.

50.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

51.     Denied.

52.     Denied.

53.     Denied.

**COUNT SEVEN**

54.     Denied.

55.     The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

56.     Denied.

57.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

**COUNT EIGHT**

58.     Denied.

59.     Denied.

60.     Denied.

61.     Denied.

62.     Denied.

63.     Denied.

## COUNT NINE

64.     Denied.

65.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

66.     Denied.

67.     Denied.

68.     The allegations of this paragraph are conclusions of law to which no response is required. To the extent a response is required, the statements of that paragraph are denied.

69.     Denied.

70.     Denied.

71.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is required, the statements of that paragraph are denied.

72.     Denied.

## COUNT TEN

73.     Denied.

74.     Denied.

## <u>AFFIRMATIVE DEFENSES</u>

Defendant further defends based on the following affirmative defenses:

### First Affirmative Defense: Unclean Hands

1.     Plaintiffs have acted in bad faith toward Defendant as to the matters contained in the Complaint. Plaintiffs' prior bad faith actions preclude relief against Defendant.

## Second Affirmative Defense: Accord and Satisfaction

2.    Defendant paid all that was owed to Plaintiffs relative to the ongoing Aunty Tootie's business development, in conformity with various oral agreements, and such payments satisfied any obligations under any purported agreements.

## Third Affirmative Defense: Breach of Contract

3.    Plaintiffs breached the various oral agreements with Defendant by failing to meet their obligations under the purported agreements.

## Fourth Affirmative Defense: Lack of Consent

4.    Defendant did not consent to Plaintiff Vennitti's sale of the branded products, which were not fit for the marketplace. In fact, Defendant explicitly ordered Vennitti not to sell the branded products.

5.    Even if Vennitti were an employee, which Defendant denies, he failed to perform his tasks, and therefore Vennitti, not Defendant, should be liable.

## Fifth Affirmative Defense: Misuse of Product

6.    Plaintiff Vennitti misused Defendant's product by selling the branded products, even though he was explicitly ordered not to.

7.    Even if Vennitti were an employee, which Defendant denies, he failed to perform his tasks, and therefore Vennitti, not Defendant, should be liable.

## Sixth Affirmative Defense: Unjust Enrichment

8.    Plaintiff Vennitti unlawfully seized the branded product owned by Defendant and, contrary to instructions by Defendant, sold it, keeping the money for himself.

9.    Through his actions, Vennitti was enriched at the expense of Defendant.

**Seventh Affirmative Defense: Failure to Act in a Commercially Reasonable Manner**

10.     Plaintiffs failed to follow UCC-required procedures in the making of the various oral agreements with Defendant.

**Eighth Affirmative Defense: Joint Venture**

11.     Defendant and Plaintiff Vennitti were engaged in a joint venture, rather than in an employment arrangement.

**Ninth Affirmative Defense: Cancellation of Contract/Resignation**

12.     Plaintiff Vennitti's actions constituted constructive cancellation of the oral contracts between himself and Defendant.

13.     Given the cancellation, Defendant cannot be liable for any claim arising from the contracts.

**Tenth Affirmative Defense: Misrepresentation**

14.     The contracts between Plaintiff Vennitti and Defendant were made under conditions of misrepresentation, as Vennitti made the offer to work for the benefit of Aquasea under false pretenses.

15.     Therefore, the contracts were the products of fraud, and are not enforceable. Defendant cannot be liable for any claim arising from the contracts.

## COUNTERCLAIMS

Defendant/Counter-Plaintiff Aquasea Group, LLC ("Defendant"), by and through undersigned counsel, bring the following counterclaims against Plaintiffs/Counter-Defendants Diamond K Meats, Inc. and Carl Vennitti, Jr.

Counter-Defendants have asserted many causes of action against Counter-Plaintiff, all stemming from a business arrangement between the parties. What Counter-Defendants fail to mention in their Complaint, however, are the numerous bad acts committed by Counter-Defendants against Counter-Plaintiff, particularly the theft and sale of Counter-Plaintiff's personal property, the branded chitterlings and the unauthorized use of the Aunty Tootie's mark. Through these actions, Counter-Defendants have deceived customers, harmed Counter-Plaintiff's business relationships, and more, egregiously damaging Counter-Plaintiff and its business venture.

### THE PARTIES

1. Defendant/Counter-Plaintiff Aquasea Group, LLC is a Washington State limited liability company.

2. Plaintiff/Counter-Defendant Diamond K Meats, Inc. is a corporation created and existing under the laws of Ohio with its principal place of business in Cleveland, Ohio.

3. Plaintiff/Counter-Defendant Carl Vennitti, Jr. is an individual residing in Warren, Ohio.

### JURISDICTION AND VENUE

4. This Court has jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1367(a).

5.      Counter-Defendant Diamond K Meats, Inc. is subject to personal jurisdiction in this District as the causes of action have arisen from Counter-Defendant's transacting business in the state. ORC Ann. 2307.382.

6.      Counter-Defendant Carl Vennitti, Jr. is subject to personal jurisdiction in this District as the causes of action have arisen from his transacting business in the state and has caused tortious injury by an act in the state. *Id*.

7.      Counter-Defendants also consent to personal jurisdiction of this Court by initiating the original suit against Counter-Plaintiff herein.

8.      Venue is proper in the Northern District of Ohio pursuant to 28 U.S.C. §1391, because a substantial part of the events giving rise to this action took place in this District, and because both Counter-Defendants reside in the District.

## FACTUAL BACKGROUND

9.      Counter-Plaintiff Aquasea Group, LLC ("Aquasea") was formed in September 2011 under the laws of Washington State. Aquasea's Limited Liability Company Agreement was made and entered into effective as of September 28, 2011.

10.     On September 28, 2012, Aunty Tootie's, LLC ("Aunty Tootie's") and Aquasea signed a Memorandum of Agreement ("MOA") regarding investment in the production and distribution of "Gourmet Chitterling Products" and any other "Aunty Tootie's" brand products, and management of the business development of Aunty Tootie's.

11.     The MOA stated that Aquasea would have three votes on a five-member board until such time that the Aquasea investor group recovered its original investment, and contemplated that Aquasea would be the managing member until the initial investment was

recovered. This arrangement was further defined in the Aunty Tootie's LLC Operating

Agreement and the "Investing Party Resolutions Agreement."

12. Aquasea's goal under the MOA was to raise approximately $6 million for the venture, with $1 million in the initial startup tranche. The venture was underway in early 2013.[1]

13. Counter-Defendant Carl Vennitti, Jr. ("Vennitti") was engaged to handle operations for the venture in or around July 2013.

14. Vennitti provided several services for the venture, including USDA and HACCP permitting consultation, processing facility construction consultation, and operations facilitation for production.

15. Aquasea retained Vennitti as an independent contractor, and paid him a total of $22,432.57, pursuant to a series of oral agreements.

16. Vennitti was not offered any employment benefits, was not presented with any employment agreement, and was paid only occasionally, as work was performed.

17. Vennitti did not have a defined work schedule with Aquasea and Vennitti chose his own work hours.

18. While working as an independent consultant for Aquasea, Vennitti maintained regular employment at a third-party wastewater treatment plant in the local area.

19. Vennitti also presented himself as a business owner of "Pocket Foods" and "V&V Enterprises" on more than several occasions.

20. Vennitti independently owned the marketing company, "Pocket Foods."

21. Vennitti signed a marketing agreement with Aunty Tootie's for the sale of its products as an independent entity that would buy the products from Aunty Tootie's and resell

---

[1] The venture ended up securing approximately $500,000 in funding over the course of the project, with another $100,000 of working "credits" contributed by the Aquasea principals.

them to his established customers. Upon information and belief, Vennitti never sold any products under this agreement.

22.     In a September 10, 2012 letter to a representative of Aunty Tootie's, Vennitti stated that "V&V enterprises will…help augment a successful product launch for the Aunty Tootie's Brand," and that "V&V's specific targeted markets can provide a minimum of 20,000 lbs. of initial product sales per month and incremental and exponential growth forward." Exhibit #1.

23.     Through oral agreement, Vennitti agreed to provide consulting services for USDA and HACCP permitting through February and March 2013, and was paid $4,000 on April 12, 2013. *See* Exhibit #2.

24.     Through oral agreement, Vennitti agreed to provide consulting services through April and May, and June 2013 for the initial startup of the Warren facility production, and was paid an aggregate of $5,000 for these services on June 10, 17, and 26, 2013. *See* Exhibit #2.

25.     Starting in the middle of July 2013, Vennitti was temporarily utilized as a manager to provide oversight and management of the Warren facility operations. He was tasked to begin production in the facility as an independent facilitator, without day-to-day oversight by Aquasea.

26.     Vennitti independently organized and managed limited production of the Warren facility operations for 6 weeks. Vennitti was paid an aggregate of $7,500 for these services, establishing a baseline of $5,000 per month for such services.

27.     All funding to Vennitti was advanced against future sales, wherein Vennitti was to receive a "share" of such sales revenue as his compensation.

28.     On September 4, 2013, Aquasea, through Mr. Kim Boddy, sent a letter to Vennitti informing Vennitti that his September 10, 2012 letter "created the foundation for the Aquasea funding of the Aunty Tootie's Venture," and that he had so far failed to perform on his commitments, and was accordingly in arrears for $220,800. *See* Exhibit #3.

29.     On January 6, 2014, Vennitti submitted to Aunty Tootie's, and *not* to Aquasea, an invoice listing various services he had provided, including "spot consultation services," demonstrating that he did not view himself as an employee of Aquasea. *See* Exhibit #4.

30.     In or around August 2013, Vennitti informed Aquasea that Aunty Tootie's principals were removing the product inventory from the Warren, Ohio facility without authorization and in violation of the USDA inspection regulations.

31.     Aquasea responded to Vennitti's information by instructing Vennitti to secure removal of the product inventory from the Warren facility to a cold storage facility in Cleveland for safekeeping.

32.     Vennitti asked friends or colleagues at Diamond K to provide this service, and the product inventory was transferred from the Warren facility to Diamond K accordingly.

33.     In late August, Aquasea had prepaid Diamond K $3,465 for Raw Material inventory, which Aquasea had later cancelled. Due to this cancellation, Aquasea received a monetary credit from Diamond K.

34.     Aquasea instructed Vennitti to inform Diamond K that the unallocated funds, held as a credit from Diamond K, would be used as prepayment for the cold storage services of the product inventory from the Warren facility.

35.     264 cases of chitterlings, totaling 3,168 pounds of product, were shipped to Diamond K in Cleveland. These cases had an invoiced valuation of $39,346.56. This volume of

product represents an average in/out cold storage fee of $0.25/pound, and an average monthly storage fee of $.05/pound. [2] The prepayment total of $3,465 therefore provided for 16 months of cold storage services.

36.     At the end of August 2013, the Warren facility was shut down and Aquasea entered into litigation against the Aunty Tootie's Founders Group for investment fraud.[3]

37.     Vennitti was engaged as Aquasea's local agent during this time to facilitate the legal process in Ohio. *See* Exhibit #5.

38.     Aquasea advanced additional funds to Vennitti throughout September, October, November, and December, totaling $13,432.57. This included his compensation for the Warren facility operations in July and August, and additional funds for Agent services. *See* Exhibit #2.

39.     Because of the legal dispute between the Aunty Tootie's Founders Group and Aquasea, Aunty Tootie's rescinded its licensing of the Aunty Tootie's trademark, which precluded Aquasea from selling the already branded products as "Aunty Tootie's." This also required Aquasea to establish new branding with the USDA for public sales.

40.     Prior to these legal issues[4], Aquasea had been working on the USDA certification of new trademarked product brands, because Aquasea believed there was no value in the "Aunty Tootie's" brand, and accordingly sought to create a new series of brands specific to local markets.

41.     In February 2014, Aquasea was informed[5] that it was allegedly violating Aunty Tootie's trademark rights. As Aquasea's agent in Ohio, Vennitti was instructed to respond, and

---

[2] For a total of $792 and $160, respectively.
[3] Case No. 4:13-02286-SL in the United States District Court for the Northern District of Ohio, Eastern Division.
[4] Specifically, in August to December 2013.
[5] Through a letter by Mr. Ray L. Weber of Renner-Kenner Co., LPA, Aunty Tootie's intellectual property attorney.

was instructed to inform Aunty Tootie's attorney that Aquasea did not intend to ever sell the "Aunty Tootie's" branded product.

42.     On February 5, 2014, Vennitti sent a letter to Aunty Tootie's intellectual property attorney, Mr. Ray L. Weber of Renner-Kenner Co., LPA, stating, "[T]here is no 'Aunty Tootie' product in commerce. Aquasea's position on the Intellectual Property [that it would not use any of Aunty Tootie's intellectual property] precluded us from selling any product bearing the 'Aunty Tootie's' mark." *See* Exhibit #6.

43.     Upon information and belief, and as evidenced by his letter to Mr. Ray L. Weber, Vennitti was fully aware that Aquasea had no intention of ever selling the "Aunty Tootie's" branded products, because Aquasea had internally discussed rebranding, repackaging, and giving away the product in promotional market development, but never actually selling the product to any party.

44.     However, Vennitti, in direct contradiction of this internal discussion, and without notification to or authorization from Aquasea, seized the Aquasea-owned product that was in cold storage at the Diamond K facility and sold the "Aunty Tootie's" branded product. Upon information and belief, Vennitti colluded with Diamond K in engaging in these acts.

45.     These illicit actions led to a trademark lawsuit by Aunty Tootie's against Vennitti and Diamond K.[6]

46.     Aunty Tootie's prevailed in the aforementioned trademark case, and earned a total judgment of $30,000.

47.     The joint venture between Aquasea and Aunty Tootie's LLC was abandoned after the first quarter of 2014.

---

[6] Case No. 5:15-cv-00054-DAP in the United States District Court for the Northern District of Ohio, Eastern Division.

48.     Upon information and belief, Vennitti and Diamond K, through the present lawsuit, are now attempting to blame Aquasea for their own unlawful behavior.

49.     Aquasea vehemently denies any wrongdoing on its own part, and instead asserts numerous counterclaims against Vennitti and Diamond K based on the aforementioned acts.

## COUNTERCLAIM I

### Breach of Contract Against Diamond K and Vennitti

50.     Counter-Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

51.     There was an oral contract between Counter-Plaintiff and Vennitti, in which Vennitti was retained as an independent contractor for his services.

52.     There was a contract between Counter-Plaintiff and Diamond K, in which Diamond K agreed to store Counter-Plaintiff's product.

53.     Counter-Plaintiff Aquasea met all of its obligations under the contracts.

54.     All of the conditions required by the contract for Vennitti's and Diamond K's performance had occurred.

55.     Vennitti breached his contract by unlawfully taking and selling branded products belonging to Counter-Plaintiff, which was prohibited by the contract.

56.     Diamond K breached its contract by unlawfully taking and selling branded products belonging to Counter-Plaintiff, which removed the products from storage.

57.     Counter-Plaintiff was damaged by these breaches.

## COUNTERCLAIM II

### Tortious Interference with Business Relationships Against Diamond K and Vennitti

58.     Counter-Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

59.     Counter-Plaintiff had an ongoing business relationship with Aunty Tootie's.

60.     Counter-Defendants Vennitti and Diamond K had knowledge of this relationship.

61.     Vennitti and Diamond K intentionally interfered with this relationship by unlawfully taking and selling, without Counter-Plaintiff's knowledge or consent, the "Aunty Tootie's" branded product.

62.     Vennitti's and Diamond K's intentional interference caused a breach of the relationship between Counter-Plaintiff and Aunty Tootie's, as Aunty Tootie's had rescinded its licensing of the Aunty Tootie's trademark to Counter-Plaintiff.

63.     Counter-Plaintiff has suffered damages as a result of the foregoing actions. Specifically, Counter-Plaintiff lost potential investors, inventory, its entire investment in the venture, and its potentially lucrative business development with Aunty Tootie's.

## COUNTERCLAIM III

### Unjust Enrichment of Vennitti and Diamond K

64.     Counter-Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

65.     Counter-Defendant Vennitti was unjustly enriched when he sold Counter-Plaintiff's branded product without Counter-Plaintiff's knowledge or consent, keeping the profits for himself.

66.     Counter-Defendant Diamond K received a portion of the profits from the sale of Counter-Plaintiff's branded product without Counter-Plaintiff's knowledge or consent, which was in excess already paid by the Counter-Plaintiff.

67.     This unjust enrichment was at the expense of Counter-Plaintiff, who lost money and inventory and suffered damage in its business relationship with Aunty Tootie's.

68.     Accordingly, equity deems that restitution should be made by Counter-Defendants.

## COUNTERCLAIM IV

### Deceptive Trade Practices Under ORC Ann. § 4165.02 Against Vennitti

69.     Counter-Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

70.     Counter-Defendant Vennitti engaged in deceptive trade practices by passing off goods as those of another; causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods; causing likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; and representing that goods have sponsorship or approval that they don't have.

71.     Counter-Plaintiff has been injured by Counter-Defendant's engaging in these deceptive trade practices, and is therefore entitled to damages.

## COUNTERCLAIM V

### Conversion Against Diamond K and Vennitti

72.     Counter-Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

73.     Counter-Plaintiff owned the chitterlings, Counter-Plaintiff's personal property, at the time Counter-Defendants unlawfully took them from the warehouse.

74.     Counter-Defendants intentionally interfered with this personal property by taking it from the warehouse without Counter-Plaintiff's knowledge or consent and selling the property without Counter-Plaintiff's knowledge or consent.

75.     This interference deprived Counter-Plaintiff of possession and use of the property and disposed of Counter-Plaintiff's property rights.

76.     Counter-Plaintiff was damaged by this interference and deprivation of possession and use of its property.

### COUNTERCLAIM VI

### Civil Conspiracy Against Diamond K and Vennitti

77.     Counter-Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

78.     Upon information and belief, Counter-Defendants Diamond K and Vennitti together agreed to commit the unlawful act of conversion against Counter-Plaintiff.

79.     Counter-Defendants engaged in the unlawful tort of conversion against Counter-Plaintiff, which was independent from the conspiracy itself.

80.     Counter-Defendants did so purposely, without a reasonable or lawful excuse, to the injury of Counter-Plaintiff.

81.     Counter-Plaintiff was injured because he was deprived of possession and use of the personal property that was converted by Counter-Defendants.

## COUNTERCLAIM VII

### Breach of Fiduciary Duties by Vennitti

82.     Counter-Plaintiff incorporates each of the foregoing allegations as if fully set forth herein.

83.     Counter-Defendant Vennitti was the agent of Counter-Plaintiff, and therefore owed Counter-Plaintiff fiduciary duties, including the duties of full disclosure, loyalty, and faithfulness to the principals.

84.     Vennitti breached his fiduciary duty of full disclosure by failing to disclose to Counter-Plaintiff that he was taking and selling product from the warehouse without the consent of Counter-Plaintiff.

85.     Vennitti breached his fiduciary duty of loyalty by engaging in unlawful and self-dealing behaviors to the detriment of Counter-Plaintiff.

86.     Vennitti breached his fiduciary duty of faithfulness to the principals by colluding with Diamond K to take and sell product from the warehouse to the detriment of Counter-Plaintiff.

87.     Counter-Plaintiff was damaged by Counter-Defendant Vennitti's breach of his fiduciary duties.

## <u>JURY DEMAND</u>

Defendants demand a trial by jury on all issues so triable.

Respectfully submitted,


/s/Eric J. Menhart*
Eric Menhart, Esq.
Lexero Law
316 F St. NE, Suite 101
Washington, DC 20002
Phone: 855-4-LEXERO (855-453-9376) Ext. 101
Fax: 855-4-LEXERO (855-453-9376)
Eric.Menhart@Lexero.com

/s/Matthew L. Alden
Matthew L. Alden
Luftman, Heck & Associates, LLP
2012 W. 25th St., Ste. 701
Cleveland, OH 44113
malden@lawlh.com
Direct: 216-978-4778
Fax: 216-539-9326

* Admitted *Pro Hac Vice*

Attorneys for Defendant Aquasea Group, LLC


## CERTIFICATE OF SERVICE

I hereby certify that on the date of this filing a copy of the foregoing was served via electronic case filing and all parties of record were served by that system.


/s/Eric J. Menhart*
Eric Menhart, Esq.